HIGH SIERRA HIKERS ASSOCIATION; Forest Service Employees for Environmental Ethics and Wilderness Watch, Plaintiffs–Appellants,

and

National Forest Recreation Association, High Sierra Packers Association; Yosemite Trails Pack Station; Minarets Pack Station; D & F Pack Station; High Sierra Pack Station; Mammoth Lake Pack Outfit; McGee Creek Pack Station; Frontier Pack Trains; Reds/Agnew Meadows; Rock Creek Pack Station; Berner's Pack Outfits; Bishop Pack Outfitters; Cottonwood Pack Station; Glacier Pack Train; Rainbow Pack Outfitters, Intervenors,

v.

Jack A. BLACKWELL, Regional Forester, Region 5 of the U.S. Forest Service; Jeffrey Bailey, Supervisor, Inyo National Forest; James Boynton, Supervisor, Sierra National Forest; Dale A. Bosworth, Chief, U.S. Forest Service; United States Forest Service, Defendants–Appellees.

---

6. *Miles,* 108 F.3d at 1113.

High Sierra Hikers Association; Forest Service Employees for Environmental Ethics and Wilderness Watch, Plaintiffs–Appellees,

and

National Forest Recreation Association, High Sierra Packers Association; Yosemite Trails Pack Station; Minarets Pack Station; D & F Pack Station; High Sierra Pack Station; Mammoth Lake Pack Outfit; McGee Creek Pack Station; Frontier Pack Trains; Reds/Agnew Meadows; Rock Creek Pack Station; Berner's Pack Outfits; Bishop Pack Outfitters; Cottonwood Pack Station; Glacier Pack Train; Rainbow Pack Outfitters, Intervenors,

v.

Jack A. Blackwell, Regional Forester, Region 5 of the U.S. Forest Service; Jeffrey Bailey, Supervisor, Inyo National Forest; James Boynton, Supervisor, Sierra National Forest; Dale A. Bosworth, Chief, U.S. Forest Service; United States Forest Service, Defendants–Appellants.

High Sierra Hikers Association; Forest Service Employees for Environmental Ethics and Wilderness Watch, Plaintiffs–Appellees,

National Forest Recreation Association, High Sierra Packers Association; Yosemite Trails Pack Station; Minarets Pack Station; D & F Pack Station; High Sierra Pack Station; Mammoth Lake Pack Outfit; McGee Creek Pack Station; Frontier Pack Trains; Reds/Agnew Meadows; Rock Creek Pack Station; Berner's Pack Outfits; Bishop Pack Outfitters; Cottonwood Pack Station; Glacier Pack Train; Rainbow Pack Outfitters, Intervenors–Appellants,

v.

Jack A. Blackwell, Regional Forester, Region 5 of the U.S. Forest Service; Jeffrey Bailey, Supervisor, Inyo National Forest; James Boynton, Supervisor, Sierra National Forest; Dale A. Bosworth, Chief, U.S. Forest Service; United States Forest Service, Defendants.

Nos. 02–15504, 02–15505, 02–15574.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 2003.

Filed Aug. 25, 2004.

Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, for the plaintiffs-appellants-cross-appellees.

David C. Shilton, Appellate Section, U.S. Department of Justice, Washington, DC, for the defendants-appellees-cross-appellants.

Donald R. Dinan, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Washington, DC, for National Forest Recreation Association, High Sierra Packers Ass'n, Minarets Pack Station, Mammoth Lake Pack Outfit, McGee Creek Pack Station, Frontier Pack Trains, Reds/Agnew Meadows, Rock Creek Pack Station, Berner's Pack Outfits, Bishop Pack Outfitters, Cottonwood Pack Station, Glacier Pack Train and Rainbow Pack Outfitters.

John E. Dicks, Gardnerville, NV, for High Sierra Packers Ass'n, Yosemite Trails Pack Station, D & F Pack Station, and High Sierra Pack Station.

Before: HUG, GIBSON,* and FISHER, Circuit Judges.

HUG, Circuit Judge:

Plaintiffs, High Sierra Hikers Association, et al. (collectively "High Sierra") brought the present suit against the United States Forest Service[1] ("Forest Service") seeking declaratory and injunctive relief for management practices in the John Muir and Ansel Adams Wilderness Areas. Plaintiffs are nonprofit organizations dedicated to conservation, education, and wilderness protection. Each organization has members who use the Ansel Adams and John Muir Wilderness Areas for various recreational activities. Their standing to bring this action is uncontested. Pursuant to the parties' stipulation and consent, the case was referred to U.S. Magistrate Judge Elizabeth D. Laporte. This case reaches this court on appeal and cross-appeal and poses the question of whether the Forest Service complied with the mandates of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370F, and the Wilderness Act, 16 U.S.C. §§ 1131–1136, when it issued multi-year special-use permits and granted renewals of special-use permits to commercial packstock operators in the wilderness areas. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## I. Background

Encompassing over 800,000 acres, the John Muir and Ansel Adams Wilderness Areas provide some of the most beautiful and picturesque natural wonders in the world. Stretching north to Mammoth Lakes and over 100 miles south to Lone Pine, California, the John Muir Wilderness Area includes elevations ranging from 4,000 to 14,497 feet, the summit of Mt. Whitney, the highest point in the lower 48 states. Embracing unique geologic and natural areas, the Ansel Adams Wilderness Area represents one of the most beautiful alpine regions in the Sierra Nevada range. Both wilderness areas provide users recreational opportunities such as hiking, camping, fishing, and some of the finest mountain climbing in the world. Packstock, including horses and mules, have traditionally been used to access the wilderness areas.[2] Commercial packstock operators provide the public with the opportunity to take guided trips into the wilderness areas, transport equipment for backcountry visitors, and enable access for people who would otherwise not be able to hike in these areas.

The John Muir and Ansel Adams Wilderness Areas are located within the Inyo and Sierra National Forests. Each National Forest contains some portion of each wilderness area. In 1979, the Forest Service adopted a management plan for both the John Muir and Ansel Adams Wilderness Areas. In 1988 and 1992, the Forest Service adopted a Land Resource Management Plan ("Management Plan") for the Inyo National Forest and Sierra National Forest, respectively, and prepared an environmental impact statement ("EIS") for each Management Plan.

---

* The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. The named defendants are the Forest Service itself, the Chief of the Forest Service, the Regional Forester, and two Forest Supervisors.

2. "Long ago I made these Sierra trips, carrying only a sackful of bread with a little tea and sugar and thus was independent and free, but now that trails or carriage roads lead out of the (Yosemite) Valley in almost every direction it is easy to take a pack animal, so that the luxury of a blanket and a supply of food can easily be had." John Muir, The Yosemite (1912).

The Forest Service regulates the usage of the wilderness areas by the issuance of permits. Members of the general public must obtain a "wilderness permit" for an overnight visit. The Forest Service limits the number of these wilderness permits by specific trailheads. Some trailheads have daily quotas that are determined by capacity limits for wilderness zones. Commercial outfitters and guides, including those with livestock, who operate commercial services must obtain a "special-use permit." The amount of wilderness use the commercial operators are allowed is dictated by "service day allocations." A "service day" equals "one person being assisted by an outfitter or guide and using the wilderness for one day."

In 1997, the Forest Service issued a draft EIS proposing the replacement of existing Management Plans with new management plans for the Ansel Adams and John Muir Wilderness Areas. In February 1999, the Forest Service announced that it would issue a revised draft EIS, which it did in August 2000.

On April 10, 2000, High Sierra brought suit in federal district court seeking declaratory and injunctive relief against the Forest Service for management practices in the John Muir and Ansel Adams Wilderness Areas. Specifically, High Sierra alleged that the Forest Service's authorization of special-use permits to commercial packstock operators violated NEPA, the Wilderness Act, the National Forest Management Act, 16 U.S.C. §§ 1600–1687, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706.

On May 12, 2000, a group of commercial packstock operators (hereinafter "Intervenors" or "packers") who operate in the Ansel Adams and John Muir Wilderness Areas sought to intervene. The district court bifurcated the proceeding into a merits phase and remedy phase. The district

court denied the motion to intervene as to the merits phase of the proceeding, allowing the packers status as *amici curiae*, but granted the packers full participation as to the remedy phase of the proceeding.

On December 19, 2000, the Forest Service filed a motion to dismiss or alternatively for summary judgment on the grounds that: (1) High Sierra's challenges to the Forest Service's management program for the two wilderness areas amount to an impermissible programmatic challenge barred by *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); and (2) there was no final agency action from which High Sierra could obtain relief under the APA.

On December 20, 2000, High Sierra filed a motion for summary judgment. High Sierra sought declaratory relief that the Forest Service had: (1) violated the National Forest Management Act by failing to implement or meet Forest and Wilderness Standards; (2) violated the Wilderness Act by failing to determine that commercial services are necessary and proper, and by allowing services that degrade wilderness values; and (3) violated NEPA by failing to prepare environmental analyses before issuing special-use permits and other instruments that allow commercial services to be performed in the wilderness areas.

On March 13, 2001, the court held a hearing on Plaintiffs' Motion for Summary Judgment and Defendants' Motion to Dismiss or for Summary Judgment.

On April 20, 2001, the Forest Service issued a final EIS, a Record of Decision, and a 2001 Wilderness Management Plan for the two wilderness areas. In the Record of Decision, the Forest Service adopted a plan that replaced the existing wilderness plans for the Ansel Adams and

the John Muir Wilderness Areas and made "non-significant amendments" to the Management Plan for the Sierra and Inyo National Forests. Subsequent to the issuance of the final EIS, the district court ordered High Sierra and the Forest Service to file supplemental briefs addressing the effect of the 2001 Wilderness Management Plan, the final EIS, and the Record of Decision on the case.

On June 5, 2001, the court issued a decision on the merits phase of the proceeding, which granted the Forest Service's motion for summary judgment as to the claims brought under the Wilderness Act and the National Forest Management Act. The district court found that the final EIS and the Record of Decision, accompanying the 2001 Wilderness Management Plan, had analyzed the need for stock services and concluded that such services were necessary. The court found that the claims were thus mooted as to the Forest Service's failure to make this determination. The district court also granted the Forest Service summary judgment on High Sierra's claim that the Forest Service was violating the Wilderness Act by allowing commercial services that degraded the wilderness areas. The district court found that the Forest Service was vested with broad discretion under the Wilderness Act to determine how much commercial pack use to allow and how to deal with the impacts. However, the district court granted High Sierra's motion for summary judgment on the NEPA claim. The district court found that the Forest Service was violating NEPA by issuing multi-year special-use permits and granting one-year renewals of special-use permits to commercial packers without first analyzing the impact by completing an EIS.

On January 9, 2002, after receiving additional briefing on appropriate relief under NEPA, the district court issued an order, granting injunctive relief and ordering the Forest Service to complete a NEPA analysis of cumulative impacts by December 31, 2005, and a site-specific analysis for each permittee by December 31, 2006. In the interim, the district court ordered a reduction in the allocation of special-use permits and limited access to areas of environmental concern.

Both sides appeal. High Sierra appeals the grant of summary judgment on the Wilderness Act claims. The Forest Service appeals the district court's grant of injunctive relief for the NEPA violations.

## II. Standard of Review

A grant of summary judgment is reviewed de novo and this court may affirm on any ground supported by the record. *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 n. 17 (9th Cir.1995). De novo review of a district court judgment concerning the decision of an administrative agency means the court views the case from the same position as the district court. *Nev. Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir.1993).

The APA governs the review of agency action. *Dickinson v. Zurko*, 527 U.S. 150, 152, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). Under the APA, a court may set aside an agency action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy*, 898 F.2d 1410, 1414 (9th Cir.1990) (internal quotation marks omitted).

■ In *Wilderness Society v. United States Fish & Wildlife Service*, our en banc panel court addressed the question of the level of deference due to the Forest Service when it makes decisions implementing the Wilderness Act. 353 F.3d

1051, 1059–60 (9th Cir.2003) (en banc). We apply the framework articulated in that case to determine what level of deference to apply to the facts at hand. If the statute is clear and unambiguous, no deference is required and the plain meaning of Congress will be enforced. *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Wilderness Soc'y,* 353 F.3d at 1061. If the statute is ambiguous, the agency's decision is entitled to *Chevron* deference if it has the force of law. *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). If the decision does not have the force of law, it is reviewed with "respect" according to the factors set out in *Mead* and *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *Wilderness Soc'y,* 353 F.3d at 1067.

■ A district court's grant of permanent injunctive relief is reviewed for abuse of discretion or application of erroneous legal principles. *See Biodiversity Legal Found. v. Badgley,* 309 F.3d 1166, 1176 (9th Cir.2002) (noting that underlying legal rulings are reviewed de novo).

### III. Discussion

A. Ripeness

The Supreme Court has made clear that the APA does not allow "programmatic" challenges to agency land management procedures, but instead requires that there be a specific final agency action which has an actual or immediate threatened effect. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882–894, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In *Lujan,* the plaintiffs alleged that the defendants violated the Federal Land Policy Act, NEPA and APA in the administration of the "land withdrawal review program" of the Bureau of Land Management, but failed to challenge any particular agency action that caused

harm. *Id.* at 875, 891, 110 S.Ct. 3177. The Court held that the "land withdrawal review program" was not an identifiable, much less final, agency action or series of such actions within the meaning of the APA, but rather a general label sweeping into its purview policies and practices as broad and multi-faceted as those of a "drug interdiction program" of the Drug Enforcement Administration. *Id.* at 890, 110 S.Ct. 3177.

■ In the present dispute, both the Forest Service and Intervenors contend that High Sierra has made an impermissible programmatic challenge to the forest management plan and have failed to allege any specific challenges to a final agency action.

■ We disagree. High Sierra has alleged specific discrete agency actions taken by the Forest Service that have caused harm. High Sierra did not challenge the entirety of the wilderness plan, but instead challenged certain agency actions, for example the grant of certain special-use permits, and the calculation of certain trailhead limits. In its complaint, High Sierra challenged the issuance of "special-use permits" in the Inyo and Sierra National Forests. A special-use permit is the legal instrument by which the Forest Service authorizes commercial services, 36 C.F.R. § 251.50. The issuance of a specific special-use permit is a final agency action that has an actual or immediately threatened effect sufficient to trigger standing under *Lujan. See Neighbors of Cuddy Mtn. v. Alexander,* 303 F.3d 1059, 1067 (9th Cir.2002) (holding that a specific sale of timber was a final agency action).

Because we find that specific discrete agency actions have been alleged, we address all of the issues on the merits.

B. National Environmental Policy Act

 NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Cuddy Mtn.*, 303 F.3d at 1070 (internal quotation marks omitted). The Act mandates that an EIS be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, the agency may prepare an Environmental Assessment ("EA") to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir.2001); *see* 40 C.F.R. § 1508.9. If the EA establishes that the agency's action "may have a significant effect upon the environment" then an EIS must be prepared. *Nat'l Parks*, 241 F.3d at 730. The EIS must include an examination of the cumulative impacts of proposed actions. *Cuddy Mtn.*, 303 F.3d at 1071. A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ... [and] ... can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

 Typically, an agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard. *Ka Makani'OKohala Ohana Inc. v. Water Supply, Dept.*, 295 F.3d 955, 959 n. 3 (9th Cir.2002); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir.1998). We will defer to an agency's decision only if it is "fully informed and well considered," *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir.1988). Further, when an agency has taken action without observance of the procedure required by law, that action will be set aside. *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir.2000).

The district court found the Forest Service in violation of NEPA by issuing special-use permits and allowing renewals of special-use permits to commercial packstock operators without first analyzing the environmental impact. *See High Sierra Hikers Ass'n v. Powell*, 150 F.Supp.2d 1023, 1041–1044 (N.D.Cal.2001). The district court granted injunctive relief, and ordered the Forest Service to complete NEPA analysis of the cumulative impacts by December 31, 2005 and site-specific analysis for each permittee by December 31, 2006. In the interim, the district court ordered a reduction in the allocation of special-use permits, and limited access to areas of environmental concern.

 We first address the alleged violations of NEPA through the issuance of multi-year special-use permits and through the renewals of already existing special-use permits.

1. Issuance of Multi–Year Special–Use Permits

The issuance of multi-year special-use permits to the commercial packers constitutes "major federal action" and requires the agency to prepare a detailed EIS. 42 U.S.C. § 4332(2)(C). The Forest Service acknowledges that the protections of NEPA are implicated through the issuance of the permits, and expresses an intent to comply with NEPA with respect to future permit renewals after they complete the process of deciding whether to issue new wilderness plans.

However remorseful the agency may be for failing to fulfill its statutory mandates, it is quite clear that it has breached its obligation under NEPA by failing to take the requisite "hard look" at the environmental consequences of its proposed action. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). It is without question that NEPA applies to the issuance of the multi-year special-use permits and the district court correctly found that this oversight would likely require the completion of an EIS "in light of the cumulative impacts of the numerous permits." *High Sierra,* 150 F.Supp.2d at 1043. We hold that the district court correctly found a violation of NEPA through the issuance of the multi-year special-use permits.

### 2. Renewal of Special–Use Permits

■ The district court found that the one-year renewals of special-use permits were impermissibly characterized by the Forest Service as "categorical exclusions" outside the purview of NEPA. On appeal, the Intervenors revive this argument contending that the one-year renewals of the special-use permits fit within the Forest Service's regulations as a categorical exclusion.[3]

It is true that under Forest Service policy, the agency may categorically exclude certain actions that constitute the "approval, modification, or continuation of minor short-term (one-year or less) special uses of National Forest land. . . ." *Alaska Ctr.,* 189 F.3d at 854 (9th Cir.1999) (citing Forest Service Handbook 1909.15, 30.3(1)(a)-(b)); *see also High Sierra,* 150 F.Supp.2d at 1043. However, the Forest Service's own regulations do not permit the categorical exclusion of activities in wilderness areas. Forest Service Handbook 1909.15, 30.3(1)(a)-(b). A categorical exclusion cannot be used if extraordinary circumstances exist which include "congressionally designated areas, such as *wilderness,* wilderness study areas, or National Recreational Areas." *Id.* Therefore, the one-year renewals of the special-use permits were not allowable categorical exclusions and require the issuance of an EA or an EIS.

The agency's failure to prepare an EIS prior to the renewal of the special-use permits has violated NEPA by failing to take the requisite "hard look" at the environmental consequences of its proposed action. *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851; *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992). Therefore, we hold that the district court correctly found NEPA violations through both the issuance of multi-year special-use permits and renewals of special-use permits.

### 3. Injunctive Relief

■ Having concluded that the Forest Service committed clear NEPA violations, we now turn to the equitable relief ordered by the district court. On appeal, the Forest Service argues that the scope of the injunctive relief granted, in particular, the requirement that the agency conduct a separate NEPA process analyzing the cumulative impacts of packstock operations no later than December 31, 2005, imposes significant and inappropriate burdens on the Forest Service and should be reversed. The crux of its argument is that the district court's order erred as a matter of law

---

**3.** The Forest Service argued before the district court that the one-year renewal of the special-use permits fit within the categorical exclusion of "minor short-term (one-year or less) special uses" of National Forest land.

*Alaska Ctr. for the Env't v. United States Forest Serv.,* 189 F.3d 851, 854 (9th Cir.1999). However, the agency has abandoned this argument on appeal.

by improperly intruding on the agency's scope of discretion by ordering an analysis of the cumulative impacts prior to the individual site-specific analysis. Intervenors reiterate these arguments and also contend that the district court improperly included the west side packers in the injunctive relief order.

 A district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 999 (9th Cir.2000)(internal quotation marks omitted). The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. *Id.* "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *Id.* at 545, 107 S.Ct. 1396.

a. *Irreparable Injury*

 In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action. *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.1985). While an injunction does not automatically issue upon a finding that an agency violated NEPA, "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction." *American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir.1983). If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396.

The record is abundantly clear that not only is environmental injury to the wilderness areas "likely," but that injury continued unabated until the injunctive relief order was issued. The district court found that there was sufficient evidence to link commercial packstock with injury to environmentally sensitive areas[4] and a reduction in the population of sensitive species.[5] The record clearly supports the likelihood of continued injury absent adequate protective measures. The district court balanced the environmental and economic concerns raised by the commercial packers' continued operation in the wilderness areas.[6] The district court crafted a fair and balanced injunction that provided for

---

4. A Cascade Valley Ranger describes a meadow below the third crossing in his area as "the most overused and abused place in my area" and attributes the damage to pack groups. ("Closing meadows without limiting the number of stock is just moving the problem up to 3rd crossing, where we have heavy grazing, dead trees and near-Range wars between pack outfits."). A District Ranger reports that a meadow damage assessment found that "85% of a one-acre meadow section was devoid of vegetation due to intensive use by pack stock." Heavy accumulations of manure and exposed tree roots were similarly noted at a campsite. Significant vegetation loss and soil compaction were noted in a packstock camp by a forest soil scientist.

5. The mountain yellow-legged frog, previously abundant in the Inyo and Sierra National Forests, has declined in number in the past five decades. Evidence in the record attributes the decline of the yellow-legged frog to various factors, including livestock activities. In addition, the Yosemite Toad has suffered in the Inyo and Sierra National Forests. Livestock activities are cited as a factor in the decline of the Yosemite Toad. While other factors also contribute to the decline of these species, the evidence shows that stock use is a contributing factor.

6. The district court's injunctive relief order stated in full that:
 1. The Forest Service shall complete the NEPA process analyzing the cumulative im-

interim relief for the environment pending compliance with NEPA and did not drastically curtail the packers' operations. After briefing from all sides on the needed remedy, the district court adopted a combination of remedies that were proposed by the parties at the hearing and in post-hearing submissions. The district court considered

the economic impact of curtailing all commercial pack operations in the interim, and chose only to reduce the current levels in order to minimize the harm.

b. *Public Interest*

In determining whether to issue an injunction, courts also consider the public

pacts of pack stock operations no later than December 31, 2005. In conducting the cumulative impacts analysis, the Forest Service shall consider limits on numbers of stock animals used in conjunction with commercial operators; limits on group size (both number of people and number of stock both on and off trail); trail suitability for various use types; and designation of campsites for use by commercial pack stations. No later than December 31, 2006, the Forest Service must complete site-specific environmental analyses under NEPA for each permittee.

2. Pending completion of the cumulative and site-specific analyses set forth in paragraph 1, above, and issuance, or denial, of special use permits to pack stations pursuant thereto, the following restrictions shall apply:

A. The service day allocations for pack-supported overnight use set forth on pages 11 and 13 of Appendix I of the final EIS shall be reduced by twenty percent (20%). To the extent that the service day allocations differentiate between day use and overnight use, this reduction applies to overnight use only. The Forest Service and Intervenors shall use best efforts to reduce use of service days for overnight trips to the areas designated "red" and "yellow/red" in Appendix D of the final EIS proportionately, i.e., by 20%. In addition, the maximum party size for overnight trips supported by commercial pack stock shall be 12 people and 20 stock. D & F Pack Station and High Sierra Pack Station are exempt from this reduction because the Forest Service has already conducted environmental analyses for those pack stations.

B. Although the Record of Decision provides for 3,000 extra service days, the Forest Service shall not authorize those additional days until the NEPA process is completed. *See* Record of Decision, April 2001, at 12 (discussion of additional service days).

C. The Forest Service shall issue all wilderness permits for commercial uses of the Ansel Adams and John Muir Wilderness Areas. Facsimile copies, or electronic mail copies that can be printed out, of the completed Forest Service-issued permits may be provided by pack station operators to their clients.

D. Implementation of the trailhead quotas will be phased-in over a two-year period. For the first year, beginning in 2002, the trailhead quotas will not exceed 130% of the quotas listed on Table 1.5 in the 2001 Wilderness Management Plan at page 20. In 2003, the trailhead quotas will not exceed 115% of the quotas listed in the 2001 Wilderness Management Plan. In 2004, the trailhead quotas will not exceed 100% of the quotas in the 2001 Wilderness Management Plan. As stated in the Record of Decision, the phase-in period does not apply to trailhead quotas that did not change. Record of Decision, April 2001, at 10. E. The Forest Orders listed in the Record of Decision will be implemented by June 1, 2002.

F. The Forest Service shall use the interim criteria set forth in Exhibit 2 to Federal Defendants' October 3, 2001 brief to approve or disapprove non-system trail use by commercial operators until the individual pack station NEPA analyses are completed.

G. In the period before the Forest Service completes cumulative impacts and site-specific environmental impacts analyses of all commercial packstock uses of the wilderness areas and issues special use permits, commercial packstock operations cannot occur except under the terms and conditions of this Order, and under any Forest Service plans, permits or directives that are consistent with this Order.

H. Plaintiffs and Intervenors shall reserve their administrative appeal rights as to the new wilderness plans.

interest. *Amoco,* 480 U.S. at 542, 107 S.Ct. 1396. Here, the alleged impact is upon two wilderness areas. Congress has recognized through passage of the Wilderness Act, 16 U.S.C. §§ 1131–1136, that there is a strong public interest in maintaining pristine wild areas unimpaired by man for future use and enjoyment. Because Congress has recognized the public interest in maintaining these wilderness areas largely unimpaired by human activity, the public interest weighs in favor of equitable relief.

### c. *Overbreadth*

■ The Forest Service argues that the district court erred as a matter of law by improperly intruding on the agency's scope of discretion by ordering a cumulative impacts analysis prior to the individual site-specific analyses. The agency contends that the order conflicts with the principle of limiting a reviewing court's power to determine the agency's task on remand, and the correct remedy was to remand the case to the agency for resolution.

Where action is ongoing while the agency complies with NEPA, this court has held that injunctive relief and the ordering of an EIS is an appropriate remedy. *Idaho Watersheds Project v. Hahn,* 307 F.3d 815, 832–33 (9th Cir.2002); *see also Blue Mtn. Biodiversity Project v. Blackwood,* 161 F.3d 1208 (9th Cir.1998); *Nat'l Parks,* 241 F.3d at 739–40.

In *Idaho Watersheds Project,* environmental groups sued the BLM for violating NEPA by issuing grazing permits to cattle ranchers. 307 F.3d at 820. This court affirmed the district court's decision to grant injunctive relief. The lower court had found the BLM to be in violation of NEPA, and ordered the agency to undertake an expedited review of the grazing permits under NEPA. *Id.* at 830–31.

While awaiting BLM compliance, the district court ordered interim relief allowing cattle grazing to continue but required that certain environmental safeguards be put in place to protect the land. *Id.* at 823. We held that the district court acted within its authority to issue the injunction and the interim relief, finding that the lower court's actions were a fair and balanced remedy. *Id.* at 835.

■ NEPA regulations are intended to ensure that environmental considerations are infused into the ongoing programs and actions of the federal government. *Idaho Sporting Congress,* 222 F.3d at 567. To this end, "EAs and EISs must be prepared early enough so that [they] can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Id.* (quoting *Save the Yaak,* 840 F.2d at 718). Therefore, the requirement that the cumulative impacts be assessed by December 2005 not only comports with the requirements of NEPA, but is necessary as an important contribution to the decisionmaking process. *Id.* The Forest Service's continued failure to comply with NEPA not only increases the likelihood of environmental degradation by the cumulative impacts of commercial packstock operators, it ensures it.

The Forest Service also argues that the district court's order violates the principles set forth in *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), and that the court should wait until a proposal for action is made before determining the scope of an agency's NEPA duties. The Forest Service's reliance on *Kleppe* is misplaced. It is true that "[t]he determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the

appropriate agencies." *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718 (holding that the Department of the Interior did not need to complete a region-wide EIS for all potential mining projects in the Northern Great Plains area). However, the present case presents a starkly different situation from *Kleppe* because the specific proposal for action has been contemplated, and authorized by the Forest Service through the issuance of special-use permits and the 2001 Wilderness Plan. *Blue Mtn.*, 161 F.3d at 1215 (ordering a cumulative impact statement addressing the pro sales of forest for logging projects contemplated as part of the Forest Service's forest recovery strategy). The agency itself has recognized a continuing violation of NEPA because of its failure to assess the cumulative impacts of the special-use permits and acknowledges that the assessment needs to be undertaken. We do not find that in fashioning its relief, the district court abused its discretion by requiring the cumulative impacts to be completed by December 2005.

#### d. *West Side Packers*

■■■ Intervenors argue that facts specific to the west side packers [7] show that the injunctive relief was overbroad as applied to those operators.

The district court recognized that the Sierra National Forest prepared EAs before issuing permit renewals for the High Sierra Pack Station and the D & F Pack Station. Acknowledging these efforts, the district court carved out an exemption to the mandated 20% reduction in service days to the injunctive relief order, finding

that "D & F Pack Station and High Sierra Pack Station are exempt from this reduction because the Forest Service has already conducted environmental analyses for those pack stations."

Intervenors argue that because the Sierra National Forest complied with NEPA in issuing the special-use permits to D & F and High Sierra Pack Stations, they should be excluded from all the limitations. We disagree.

As mentioned previously, the district court has broad discretion in granting equitable relief. The injunctive relief order recognizes that the Forest Service has prepared EAs for the two pack stations. However, it also recognizes that in the overall management practices of wilderness areas, the Forest Service failed to consider the cumulative impact of the multiple pack stations operating over a substantially similar area. Further, the Forest Service acknowledges that the issuance of special-use permits constitutes a "major Federal action" which requires that the agency complete an EIS, not just an EA. 42 U.S.C. § 4332(2)(C). We hold that the district court did not abuse its discretion in imposing the injunctive relief order on the D & F and High Sierra Pack Stations.[8]

Intervenors also argue that since the remaining west side operators, the Clyde Pack Outfitters, Lost Valley Pack Station, Minarets Pack Station, and the Yosemite Trails Pack Station account for only about half of the service days in the wilderness, the impact of these operations is not "significant" and, therefore, falls outside the requirements of NEPA. This argument

---

**7.** West side packers include the High Sierra Pack Station, D & F Pack Station, Clyde Pack Outfitters, Lost Valley Pack Station, and Yosemite Trails Pack Station.

**8.** We note that D & F and High Sierra Pack Stations are not precluded from seeking a

modification of the injunction from the district court if they believe they have good cause to do so. *See, e.g., A & M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir.2002).

misses the point. The Forest Service is required to make the necessary determination of whether an EA or EIS needs to be completed in order to comply with NEPA. The agency has admitted noncompliance with NEPA, and, further, the requirement that an EIS be prepared for every special-use permit is not an abuse of the district court's discretion. The effects of the individual pack operators may very well be de minimis, but the agency has failed to make this evaluation and has failed to make findings regarding the cumulative impacts of these pack stations operating in the same areas. Cumulative impacts that result from individually minor but collectively significant actions are the crux of what the regulations implementing NEPA seek to avoid. *See* 40 C.F.R. § 1508.7; *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1306–07 (9th Cir.2003). The district court's imposition of the injunctive relief order on the west side packers was not in error. Because the district court did not abuse its discretion and did not rely on erroneous legal principles, we affirm the injunctive relief order in full.

## C. Wilderness Act

Congress enacted the Wilderness Act "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition. . . ." 16 U.S.C. § 1131(a). The Act established a National Wilderness Preservation System composed of "wilderness areas" which "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness. . . ." *Id.* The Act defines wilderness "in contrast with those areas where man and his own works dominate the landscape . . . as an area

where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c).

The agency charged with administering a designated wilderness area is responsible for preserving its wilderness character. 16 U.S.C. § 1133(b). Regulations provide that the wilderness areas will be administered "to meet the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses; and it shall also be administered for such other purposes for which it may have been established in such a manner as to preserve and protect its wilderness character." 36 C.F.R. § 293.2. The Forest Service, in resolving potential conflicts in resource use, must find that "wilderness values will be dominant to the extent not limited by the Wilderness Act." 36 C.F.R. § 293.2(c).

The Wilderness Act generally prohibits commercial enterprises in the wilderness areas, 16 U.S.C. § 1133(c), but authorizes commercial services within wilderness areas "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5). The Forest Service has interpreted this provision to allow the agency to "permit temporary structures and commercial services within the National Forest Wilderness to the extent necessary for realizing the recreational or other wilderness purposes, which may include, but are not limited to, the public services generally offered by packers, outfitters, and guides." 36 C.F.R. § 293.8.

■ High Sierra argues that 16 U.S.C. § 1133(d)(5) requires as a predicate to the authorization of commercial services that the Forest Service determine the amount and type of commercial services that are necessary and proper. This argument,

High Sierra contends, is bolstered by the statutory scheme of the Wilderness Act, which generally proscribes commercial enterprises, 16 U.S.C. § 1133(c), and allows only a narrow exception for the authorization of commercial services "to the extent *necessary.*" 16 U.S.C. § 1133(d)(5) (emphasis added). The district court granted summary judgment on this claim because it believed that the Forest Service was within its statutory discretion when it granted the permits:

■■■ It is clear that the statutory scheme requires, among other things, that the Forest Service make a finding of "necessity" before authorizing commercial services in wilderness areas. The Forest Service did so in its Needs Assessment for the John Muir and Ansel Adams Wilderness Areas, in which it found that commercial packstock operations were "necessary." The Wilderness Act is framed in general terms and does not specify any particular form or content for such an assessment; therefore the finding of "necessity" requires this court to defer to the agency's decision under the broad terms of the Act. The shortcomings and oversights in the 2001 Wilderness Act and Needs Assessment do not require us to conclude that the agency failed to fulfill its mandate to determine the necessity of commercial services in designated wilderness areas. Under the broad terms of the Act, a finding that packstock was needed to provide access to those people who would otherwise not be able to gain access for themselves or their gear, can support a finding of necessity.

However, under the terms of the Wilderness Act, a finding of necessity is a necessary, but not sufficient, ground for permitting commercial activity in a wilderness area. The finding of necessity required by the Act is a specialized one. The Forest Service may authorize commercial services only "to the *extent* necessary." 16 U.S.C. § 1133(d)(5) (emphasis added). Thus, the Forest Service must show that the number of permits granted was no more than was necessary to achieve the goals of the Act. Nowhere in the Wilderness Plan of the 2001 Needs Assessment does the Forest Service articulate why the *extent* of such packstock services authorized by the permits is "necessary."

The limitation on the Forest Service's discretion to authorize commercial services only to "the extent necessary" flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas. When administering a wilderness area, the Forest Service must balance many competing interests. The administering agency is charged with maintaining the wilderness character of the land, providing opportunities for wilderness recreation, managing fire and insect risk, and even facilitating mineral extraction activities. 16 U.S.C. § 1133.

When the Forest Service completed the Needs Assessment it examined independently three topics related to the need for commercial services: the types of activities for which commercial services are needed, the extent to which current permits are being used, and the amount of use the land can tolerate. All of these are relevant factors to consider when determining how much, if any, commercial activity is appropriate in a wilderness area. However, at some point in the analysis, the factors must be considered in relation to one another. If complying with the Wilderness Act on one factor will impede progress toward goals on another factor, the administering agency must determine the most important value and make its decision to protect that value. That is what the Forest Service failed to do in this case. At best, when the Forest Service simply con-

tinued preexisting permit levels, it failed to balance the impact that that level of commercial activity was having on the wilderness character of the land. At worst, the Forest Service elevated recreational activity over the long-term preservation of the wilderness character of the land.

■■■ The question now confronting us is what level of deference is due to the Forest Service's determination that preserving the wilderness character of the land is not the ultimate interest of the Wilderness Act. If the Forest Service is not due deference for its decision to grant the permits, then summary judgment was inappropriate on this issue. Although we believe that Congress intended to enshrine the long-term preservation of wilderness areas as the ultimate goal of the Act, the diverse, and sometimes conflicting list of responsibilities imposed on administering agencies renders Congress's intent arguably ambiguous.

■■■ Where the statute is ambiguous, the agency deserves *Chevron* deference only if it is acting with the force of law. *Wilderness Soc'y,* 353 F.3d at 1067. The Forest Service was not acting with the force of law in this case because it was granting permits, not acting in a way that would have precedential value for subsequent parties. *Mead,* 533 U.S. at 229–30, 121 S.Ct. 2164; *Wilderness Soc'y,* 353 F.3d at 1067. Therefore, the agency's determination is due only " 'respect' based on the persuasiveness of the decision." *Wilderness Soc'y,* 353 F.3d at 1067.

■■■ When applying this level of review, we look to the process the agency used to arrive at its decision. *Mead,* 533 U.S. at 228, 235, 121 S.Ct. 2164; *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. Among the factors we are to consider are the "interpretation's thoroughness, rational validity, and consistency with prior and subsequent pronouncements .... the logic[ ] and expertness of an agency decision, the care used in reaching the decision, as well as the formality of the process used." *Wilderness Soc'y,* 353 F.3d at 1068 (internal citations and quotation marks omitted). The Forest Service's determination does not meet this standard.

The Wilderness Act twice states its overarching purpose. In Section 1131(a) the Act states, "and [wilderness areas] shall be administered for the use and enjoyment of the American people *in such a manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character."* 16 U.S.C. § 1131(a) (emphasis added). Although the Act stresses the importance of wilderness areas as places for the public to enjoy, it simultaneously restricts their use in any way that would impair their future use *as wilderness.* This responsibility is reiterated in Section 1133(b), in which the administering agency is charged with preserving the wilderness character of the wilderness area.

■■■ The Forest Service's decision to grant permits at their pre-existing levels in the face of documented damage resulting from overuse does not have rational validity. In its Needs Assessment, the Forest Service listed the trailheads showing damage from overuse, but it did not take the next step to actually protect those areas by lowering the allowed usage. Given the Wilderness Act's repeated emphasis of the administering agency's responsibility to preserve and protect wilderness areas, this decision cannot be reconciled with the Forest Service's statutory responsibility. Moreover, because the Forest Service granted the permits without going through the required NEPA analysis, the decision lacked the formality it was legally required to have. Because the Forest Service made

its decision to grant the permits without the required public analysis and without consideration of the impact its decision would have on its ultimate responsibilities under the Wilderness Act, we hold that the Forest Service was not within its statutory discretion when it granted the permits and that the district court was incorrect to grant summary judgment on the Wilderness Act claims.

## IV. Conclusion

 We hold that the district court correctly found that the For Service was in violation of NEPA by failing to assess the individual and cumulative impacts of the issuance of special-use permits to commercial packstock operators in the John Muir and Ansel Adams Wilderness Areas. The district court was incorrect, however, in granting a summary judgment holding that the requirements of the Wilderness Act had not been violated. We hold that the Wilderness Act imposes substantive requirements on an administering agency and that there are triable issues of fact regarding whether the Forest Service permits violated those requirements.

The equitable relief granted by the injunction in practicality addresses most of the substantive violations of the Wilderness Act pending the Forest Service's compliance with NEPA, as ordered by the district court. However, the injunction does not address remediation of any degradation that may have been caused by packstock services before the 2001 Needs Assessment. The requirements of NEPA are procedural, to assure that the agency takes a hard look at the important environmental factors, whereas the Wilderness Act sets forth substantive requirements to protect the wilderness. Until such time as the Forest Service complies with the court's order concerning the NEPA procedural requirements, and thereafter reach-

es a decision concerning the commercial activity permissible in the Wilderness Areas, the Court's interim injunction largely addresses the requirements of the Wilderness Act. The ultimate decision of the Forest Service will remain subject to the substantive requirements of the Wilderness Act. We affirm the decision of the district court in granting the injunction, but reverse the summary judgment with respect to the Forest Service's compliance with the Wilderness Act and remand to the district court for a determination of appropriate relief under the Wilderness Act, including whether remediation of any degradation that has already occurred is appropriate.

**AFFIRMED in part and REVERSED in part and REMANDED.**